IN THE MATTER OF JOHN R. RUTLEDGE, JR., AN ATTORNEY AT LAW.

January 13, 1986.

494

## ORDER

The Disciplinary Review Board having filed a report with the Supreme Court recommending that JOHN R. RUTLEDGE, JR., of TOMS RIVER, who was admitted to the Bar of this State in 1959, be publicly reprimanded for conduct in violation of *DR* 1–102(A)(4) and (6), and good cause appearing;

It is ORDERED that the findings of the Disciplinary Review Board are hereby adopted and respondent JOHN R. RUT-LEDGE, JR., is hereby reprimanded; and it is further

ORDERED that the Decision and Recommendation of the Disciplinary Review Board, together with this order and the full record of the matter, be added as a permanent part of the file of said JOHN R. RUTLEDGE, JR., as an attorney at law of the State of New Jersey; and it is further

ORDERED that JOHN R. RUTLEDGE reimburse the Ethics Financial Committee for appropriate administrative costs.

### *Decision and Recommendation of the Disciplinary Review Board*

This matter is before the Board based upon a presentment filed by a Special Ethics Master appointed to preside over the

hearing of a complaint filed against Respondent concerning certain of his activities as Grand Master of the Grand Lodge of the Masonic Order of the State of New Jersey. The Board makes the following findings of fact:

In 1975 Respondent was elected to a one year term as Grand Master of the Grand Lodge of the Most Ancient and Honorable Society of Free and Accepted Masons of New Jersey (Masons). In 1973 a predecessor Grand Master initiated planned vacation trips through a travel agency whereby members would pay lower rates for group vacations. Included in the agreement with the travel agency was that the agency would computerize the Masonic membership list for $7,000. The agency advanced the cost for the lodge and the amount was to be paid back during a two-year period by charging each person taking a tour a $10 fee. The travel agency was to receive a predetermined amount each year with any excess going to charities selected by that Grand Master and his immediate successor. These commissions were not processed through the regular treasury fund of the Grand Lodge, nor were they included in the Lodge's budget. The two immediate preceding Grand Masters accounted for these funds informally by way of reports of their receipt and disbursement.

As Grand Master, Respondent continued the practice of arranging these group vacation trips. Respondent believed that as Grand Master he had authority to accept these travel agency commissions for his own usage. He did not conceive that he was acting as an agent or representative of the Grand Lodge. Respondent expanded this travel program by making similar arrangements with a second travel agency. From one agency, he received the following payments:

1. October 15, 1975—$4,000 used for payment on a pending personal loan.

2. December 12, 1975—$2,200 which was deposited in his law office account.

Respondent received the following payments from the second travel agency:

1. November 3, 1975—$3,400 which was used for purchase of a diamond ring.

2. February 27, 1976—$8,500 which was used as part payment on a Cadillac.

3.  April 9, 1976—$675 which had a notation on the check that it represented compensation balance due.

In May 1976 trustees of the Grand Lodge questioned Respondent about these payments. The presiding officer and trustees refused Respondent's request to submit to the membership for arbitration the issues as to whether the trustees or he were entitled to the funds. In October 1976 the trustees commenced legal action to compel Respondent to account for and make restitution of the funds they claimed he misappropriated. Following a two-day nonjury trial, the trial court on April 25, 1978 ruled in favor of the trustees and entered judgment against Respondent for $18,800 plus costs. At the trial the two immediate past Grand Masters testified that money they received from the travel agency was not kept by them personally but used for the Grand Master's charity fund. They further stated that no Grand Master had the right to take any income of the Grand Lodge for personal benefit. The money received from these trips was Grand Lodge property. Within a few days after entry of the judgment, Respondent borrowed $18,000 and paid the total amount of the judgment and costs. On May 7, 1978 the Grand Lodge filed Masonic charges of misappropriation of funds and un-Masonic conduct against Respondent. On September 16, 1978 a trial panel of the Grand Lodge found Respondent guilty of all charges. Respondent was ultimately expelled as a member of the Grand Lodge but maintained his membership in the Blue Lodge. *Rutledge v. Gulian*, 93 *N.J.* 113 (1983).

On June 3, 1982, after a referral from the Appellate Division, a formal ethics complaint was filed against Respondent by the then Division of Ethics and Professional Services (DEPS). Respondent was charged with misusing and misappropriating $18,800 and applying this amount to his own personal use, contrary to *DR* 1–102(A)(1), (3), (4) and (6). In his answer, Respondent admitted receiving the money from the travel agencies but denied that these gifts were in consideration for travel arrangements. He maintained that these payments were in return for services rendered by him to the agencies and were cash equiva-

lents in lieu of certain complimentary trips to which he was entitled. Respondent denied any unlawful misappropriation. Respondent also maintained that this matter was completely unrelated to his practice of law. The ethics proceedings were held in abeyance until the Supreme Court opinion above cited was issued.

A Special Ethics Master appointed to hear this matter found as a fact that Respondent was not acting as an individual in arranging the group trips but that these trips were enterprises of the Lodge with the Grand Master the representative of the Lodge in making the travel arrangements. Since Respondent was acting as an agent for the Lodge, the Special Master concluded that Respondent had no right to the funds, ruling that Respondent knowingly misappropriated the funds to his private use. The Special Ethics Master noted that many letters were received on behalf of Respondent attesting to his good character and honesty. These letters came from the clergy, members of the Bar who served on Ethics Committees, fellow attorneys who dealt with Respondent for over twenty years, clients and people in prominent political positions. The present Grand Master of the Lodge and the incoming Grand Master testified as character witnesses for Respondent. In recommending that Respondent be publicly reprimanded, the Special Master noted:

> that all the proceedings in connection with the activity have brought home to [Respondent] the seriousness from an ethical point of view of [Respondent's] conduct, and will serve as the telling deterrent to him in the future. The proofs support his good reputation, both as an attorney and as a person [Report of Special Ethics Master at 8].

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Special Ethics Master in finding unethical conduct on the part of Respondent are fully supported by clear and convincing evidence.

The record reveals that Respondent did not have authority to personally use the commissions received from the travel agencies. The group tours were sold to the Lodge membership through the Lodge and payment for the trips was made to the Grand Lodge Secretary. Respondent was an agent for the Lodge and, thus, had no right to use these funds for personal matters.

Although Respondent's misconduct here was not related to the practice of law, an attorney is

> obligated to adhere to the high standard required of a member of the bar even though his activities did not involve the practice of law. *In re Ryan,* 66 *N.J.* 147, 150 (1974); *In re Carlsen,* 17 *N.J.* 338, 346 (1955); *In re Genser,* 15 *N.J.* 600, 606 (1954) [*In re Franklin,* 71 *N.J.* 425, 429 (1976)].

The Board, therefore, concludes that Respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation and in conduct that adversely reflected on his fitness to practice law, contrary to *DR* 1–102(A)(4) and (6).

■ The goal in disciplinary matters is not punishment of the attorney but protection of the public. *In the Matter of Goldstein,* 97 *N.J.* 545, 548 (1984); *In re Infinito,* 94 *N.J.* 50, 57 (1983). A major concern in attorney discipline

> is the ethics lesson to be extracted from this case and the prophlylactic effect of [the Court's] decision in explaining the appropriate ethics principle. Our purpose is not to punish but to enlighten and improve the profession for the benefit of the public. See *In re Baron,* 25 *N.J.* 445, 449 (1957) [*In re Hinds,* 90 *N.J.* 604, 630 (1982)].

■ Respondent did not disclose to the trustees of the Grand Lodge his taking and use of the money. Respondent's assertion that he believed the travel agency commissions to be his personal money is not credible. Two prior Grand Masters had not retained the commissions but had applied the money to charitable work of the Lodge. Respondent's position is without merit.

The facts in this case can be analogized to *In re Franklin, supra. Franklin* put the bar on notice that improper acquisition of funds (fraudulent expense vouchers) even in a non-attorney/client relationship could result in discipline. The trans-

gressions of this Respondent, however, predate *In re Franklin*. Respondent's conduct could not have been deterred by that case. To apply that standard to the facts here would not be appropriate. See *In re Smock* 86 *N.J.* 426 (1981).

In mitigation Respondent admitted to this Board that in retrospect he would have acted differently. He expressed remorse for his actions. The Board also considered Respondent's reputation in the community and in the legal profession as evidenced by the character witnesses, and numerous letters of recommendation. See *In the matter of Weinroth*, 100 *N.J.* 343 (1985). At 421; *In re Infinito, supra*, 94 *N.J.* at 199; *In re Sears*, 71 *N.J.* 175, 199 (1976). This is the first and only disciplinary action against Respondent, a member of the bar since 1954. Most significantly the facts underlying this matter occurred in 1975–76, almost a full decade ago.

> [W]e are mindful that the events that now call for the exercise of discipline occurred more than [ten] years ago. In this case, the public interest in proper and prompt discipline is necessarily and irretrievably diluted by the passage of time [*In re Verdiramo*, 96 *N.J.* 183, 187 (1984)].

In assessing these factors, the Board has evaluated "respondent's character and the likelihood that he will engage in similar activities in the future." *In re Sears, supra*, 71 *N.J.* at 200. The totality of the circumstances was considered to determine whether this ethical deficiency was intractable and irremediable. *In the Matter of Templeton*, 99 *N.J.* 365, 376 (1985). Respondent's transgression was an aberrational incident. Under the totality of the circumstances, a six member majority of the Board recommends that Respondent be publicly reprimanded. Suspension now would be more vindictive than just. See *In re Verdiramo, supra*, 96 *N.J.* at 187. One member would suspend Respondent for a year. Two members did not participate.

The Board further recommends that Respondent be required to reimburse the Ethics Financial Committee for appropriate administrative costs.